## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBORAH STRAUB, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 2003-237J |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST MEDIA RADIO, LLC, | ) | JUDGE GIBSON |
| | ) | |
| Defendant. | ) | |

# <u>MEMORANDUM OPINION and ORDER OF COURT</u>

**GIBSON, J.**

This matter comes before the Court on First Media Radio, LLC's ("Defendant") Motion for Summary Judgment (Document No. 24), its accompanying Brief (Document No. 25) and Appendix (Document No. 26) and Deborah Straub's ("Plaintiff") Concise Statement of Facts Precluding Summary Judgment (Document No. 31), Brief in Opposition (Document No. 32), Appendix (Document No. 33), the Defendant's Reply Brief (Document No. 39) and Plaintiff's Sur-reply Brief (Document No. 40).

The Court possesses original jurisdiction over the Plaintiff's claims under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, in this matter pursuant to 28 U.S.C. § 1331, and 42 U.S.C. § 2000e-5(f)(3) and supplemental jurisdiction over the Plaintiff's Pennsylvania Human Relations Act claims in this matter pursuant to 28 U.S.C. § 1367. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## UNDISPUTED MATERIAL FACTS

For purposes of the present motion, the following facts are found to be undisputed by the Court based upon the submissions of the parties.[1]

Deborah Straub worked for Vox Allegheny, a radio station in Dubois, [Clearfield County, Pennsylvania] from June, 2000 until April, 2002. Defendant, First Media Radio, LLC, purchased and began to operate Vox Allegheny on April 1, 2002. When Defendant purchased and began to operate the Dubois radio station, it already was operating a radio station in State College, Pennsylvania. Defendant hired Michael McGough to be the District Manager, overseeing both stations. He also served as General Manager of the State College station. McGough's office was physically located in the State College station. However, he would travel to the Dubois [Station] at most once or twice a week and, indeed, sometimes they did not see him for weeks. Francis "Moose" Rosana was and is the General Manager at the Defendant's Dubois station. Alex Kolobielski was and is president and CEO of First Media Radio, and was based in Easton, Maryland. Rosana was Straub's direct supervisor. McGough supervised Rosana, and was Straub's second level supervisor. Straub first met McGough in April 2002.

When First Media Radio took over the operation of the DuBois station, and Mr. McGough became District Manager, Mr. McGough spent time analyzing the various areas

---

[1] The following facts were found to be undisputed after review of the proposed undisputed material facts and the responses thereto filed by the parties. *See* Local Rule 56.1. They are set forth without their respective referencing citations to allow the reader ease in reviewing this history. The facts are indented to indicate that they are set forth in this opinion just as they were presented by the parties. Any proposed fact not included herein was omitted because the fact was found to be in dispute, immaterial, without support in the record and/or argumentative.

of the DuBois station, as well as the State College station, and their related staff members. McGough began discussing Straub's elimination with Alex Kolobielski and Francis Rosanna beginning in the summer of 2002. Mr. McGough drafted a memo of his analyses for Mr. Kolobielski dated August 12, 2002 (approximately four months after First Media Radio became owner of the DuBois station). The August 12, 2002 memorandum, which was identified as Exhibit 14 to the McGough Deposition, states the following regarding the subject of "office staff":

> The office staff in State College is fine, but we may need to eventually make a change in DuBois. As you've already noted, Debbie Straub's bookkeeping skills appear to be marginal. On top of that, she's been in the middle of several of the personnel problems mentioned earlier. Between DuBois Business College and Penn State-DuBois, the town should be crawling with qualified candidates for this kind of position. I'm going to contact the placement offices at both schools and have them refer applicants to me in State College, just to see what's out there.

Defendant claims the decision to fire Straub was made jointly by McGough, Rosana and Alex Kolobielski.... However, according to Rosana, McGough first raised the idea of eliminating Straub. McGough, on the other hand, claims *Kolobielski* first raised the issue of eliminating Straub. (emphasis in the original). [A]ccording to Kolobielski, he, McGough, and Rosana made a "joint decision" [to terminate Straub]. Kolobielski "does not recall" who was the first person to raise the issue of firing Straub. He contends the three decided simultaneously to eliminate Straub. Mr. Kolobielski testified that he did not recall Mr. Rosana saying specifically that Plaintiff should be fired for a specific reason.

Straub has held various positions in the radio industry both inside and outside

sales, as well as serving as a continuity person writing and scheduling commercials to go on the air. When First Media began operating the DuBois station, Straub was employed in the position of office manager. Straub had held the office manager position with Vox Allegheny since January, 2001. After the First Media purchase, her duties expanded to include inputting, traffic orders, creating logs, and using various computer software programs such as Microsoft Office, Excel and Quickbooks to do her bookkeeping work and she was responsible for generating different accounting-type reports; Straub had also inputted traffic orders, created logs, worked on payroll, billing and deposits while working for Vox Allegheny. Plaintiff was taught by Nancy Doerr, the office manager from the State College station, how to do payroll under First Media Radio, and Ms. Doerr also instructed Plaintiff with regard to procedures with the computer programs and required reports. Plaintiff also was taught by and received assistance from the Company's outside accountant.

With First Media Radio as the Station's owner, Plaintiff also had direct communications with Mr. Kolobielski, First Media Radio's CEO, in that she emailed him weekly reports and spoke to him by telephone once or twice a week with regard to the station's financial matters. As office manager for First Media Radio, Plaintiff was responsible for the billing of the advertising client, accounts receivable, accounts payable and payroll. Plaintiff staffed the office in DuBois along with a full-time receptionist named Debbie Nestor, who answered the phones, greeted Station visitors, and entered advertising sales orders into the "traffic" computer system. Based on the orders entered,

4

a traffic log was created and commercials were played on the air. Plaintiff was responsible for checking the traffic order logs, merging them with music log, and generating bills to the advertising clients from the traffic computer system. Ms. Nestor assisted Plaintiff with the billing. The DuBois station is a fairly small station, having approximately nine full-time employees.

Defendant claims the decision to fire Straub was made jointly by McGough, Rosana and Alex Kolobielski.... However, according to Rosana, McGough first raised the idea of eliminating Straub. McGough, on the other hand, claims *Kolobielski* first raised the issue of eliminating Straub. (emphasis in the original). [A]ccording to Kolobielski, he, McGough, and Rosana made a "joint decision" [to terminate Straub]. Kolobielski "does not recall" who was the first person to raise the issue of firing Straub. He contends the three decided simultaneously to eliminate Straub. Mr. Kolobielski testified that he did not recall Mr. Rosana saying specifically that Plaintiff should be fired for a specific reason.

Within a week after Defendant began operation of the DuBois radio station, McGough joined Straub outside the station building [to smoke a cigarette and said "I see there's a fellow smoker"]. The two began talking about future changes and things that were going to be made better. After Mr. McGough had been out there with her for maybe four minutes, he allegedly pinched Plaintiff's cheek, once. Plaintiff described it as "a quick little thing." Plaintiff testified that Mr. McGough did not say anything improper. Plaintiff testified that she did not say anything about the pinch to Mr. McGough, or report

5

it to anyone. Plaintiff testified that she threw away her cigarette, which was almost done, and went inside. On other occasions, McGough would rub Straub's shoulders while in her office at work. McGough would walk into Straub's office, and would stand behind Straub. He then would ask her how things were going, and begin to rub her shoulders. McGough would spend up to half a minute rubbing Straub's shoulders.

Plaintiff testified that the second incident she cites took place in her office. Mr. McGough entered the office. Plaintiff was sitting at her desk. Mr. McGough said something like "hey, how's it going," to which she answered "fine." According to Plaintiff, after Mr. McGough was in her office for thirty seconds he rubbed her shoulders, for approximately twenty to thirty seconds. Plaintiff testified that there was just idle chitchat during this time. The door remained open. Mr. McGough then asked Plaintiff if Mr. Rosana was in the building. Plaintiff testified that Mr. McGough was not in her office for more than two minutes in total, then he was "off and gone." Plaintiff testified that she did not say anything to Mr. McGough about the shoulder rubbing, and indeed said nothing to anyone but her husband.

McGough then touched Straub a third time. He again walked into her office, and began to massage her shoulders for about twenty to thirty second while she was working at her desk. During this massage, McGough did not discuss anything [unrelated to work although Straub testified that she did not know if they discussed anything about work]. Again, Plaintiff testified that she said nothing about the shoulder rubbing to Mr. McGough and that she mentioned it to her husband but no one else.

6

McGough then touched Straub a fourth time. Plaintiff testified that [this] incident about which she now complains occurred in the hallway of the station Straub was working and talking to a coworker. Plaintiff testified that Mr. McGough had been talking to the receptionist and came over to say hello to Plaintiff, who was in the hallway at her office door. Plaintiff testified that she had colored her hair in a different color. McGough approached Straub, asked her what she did to her hair, and then reached up and began to play with it, touching it and grabbing it. According to Plaintiff, Mr. McGough "reached up and he was playing with–touching it, grabbing my hair" and saying "what did you do to your hair."

McGough then touched Straub a fifth time. [] Plaintiff recounted at her deposition [that it] involved her smoking with Mr. McGough outside the building on the front stoop. Plaintiff could not recall what they were talking about, but she testified that Mr. McGough was standing beside her and he reached with one hand and rubbed her back ("not real far" from her shoulders") for about ten seconds. Plaintiff testified that she stepped away, "kind of shrugged it off" and continued talking with Mr. McGough. Plaintiff testified that, again, she did not complain or mention it to anyone, except her husband.

McGough then touched Straub a sixth time. McGough rubbed Straub's shoulders for thirty seconds in her office as he stood behind her sitting in her office chair talking to her; Straub did not verbally protest but "shrugged away and moved."

McGough then touched Straub a seventh time. Straub and McGough were outside smoking cigarettes engaging in "chitchat" when McGough said "you're just so cute" and

just pinched [her] cheek. Plaintiff testified that she did not recall what prompted that action.

McGough then touched Straub an eighth time, outside the back of Defendant's building. McGough rubbed Straub's back for twenty to thirty seconds. Plaintiff admitted that she said nothing to Mr. McGough about it.

McGough then touched Straub a ninth time [in January 2003]. Again, standing outside Defendant's building while on [a smoke] break, McGough pinched Straub's cheek a "couple" times and McGough talked about how cold it was and that they were "going to have to warm up and get inside". Plaintiff testified that the final incident occurred on Thursday, January 23, 2003. Plaintiff testified that she was working in her office when Mr. McGough came in and started rubbing her shoulders. Plaintiff testified that after a few seconds she "asked him firmly not to do that ever again, just to not do it." Plaintiff testified that Mr. McGough did stop; he did not say a word, he just "glared" at her. Plaintiff testified that there were no more incidents of what she considered harassment after January 23, 2003.

McGough did not limit his touching to just Straub. He touched, or hugged at work at least three other women during 2002-2003. Straub observed McGough touching and hugging co-worker Debbie Nestor at work. McGough gave Nestor a "greeting hug" at work. McGough rubbed in a massaging manner the shoulders of salesperson Shelly Sprankle-Caine for ten or fifteen seconds in the presence of two other persons. McGough would touch Doerr in a way that she told Straub made her feel uncomfortable.

8

In late December 2002 or early January 2003, Straub again spoke with Doerr about McGough's conduct. Straub told Doerr that she was uncomfortable with McGough's conduct. Straub told Doerr about several instances of touching by McGough. Doerr told Straub that McGough had a habit of grabbing her hand when she walked down the hall, and because Doerr was not a touchy person, she did not like such touching. Doerr also told Straub that McGough would touch her back and engage in conduct that made her very uncomfortable.

Debbie Nestor testified that she turned in a notice of resignation letter on January 8, 2003. Ms. Nestor testified that she had left copies of the letter for both Mr. Rosana and Mike McGough, who was with Mr. Rosana that day out of the office at a meeting. After McGough and Rosana arrived back at the DuBois station that day, and received Ms. Nestor's resignation letter, Mr. Rosana conferred privately with Mr. McGough. Mr. McGough then took Ms. Nestor aside and told her she could not leave and that they were planning on letting Ms. Straub go after the auditors came. Ms. Nestor told Mr. Rosana she was submitting her resignation because of what she perceived as poor treatment by Plaintiff. Ms. Nestor testified that she and Ms. Straub did not get along, that she did not like the way Ms. Straub treated people and that Ms. Nestor "was in tears several times over her." Ms. Nestor testified that Mr. McGough and Mr. Rosana encouraged her to reconsider her resignation and to keep their conversation "in strictest confidence." Ms. Nestor withdrew the resignation letter after being advised that Plaintiff was not going to be around in the near future.

9

Plaintiff has alleged that on the morning of January 27, 2003, she approached Mr. Rosana, the General Manager, and asked him "what's our sexual harassment policy here." Plaintiff testified that Mr. Rosana was busy getting ready for a sales meeting, and he allegedly replied that "there is no such thing as sexual harassment," and went in his office and answered the phone. Plaintiff did not tell Mr. Rosana what she claims Mr. McGough had done.

On February 6, 2003, Plaintiff was told by Mr. McGough and Mr. Rosana that her employment was being terminated. Defendant fired Straub during a meeting in which Straub, Rosana and McGough attended. McGough told Straub that Defendant was downsizing [due to cut-backs, her job was being eliminated and that it would be done by Nancy Doerr in State College]. After the meeting, Rosana told Straub that he had just learned that very same day that Straub was to be discharged. Plaintiff testified that Mr. McGough told her they were down-sizing, and that her job was being eliminated as her job was moving to State College, where Nancy Doerr would be doing it. After Plaintiff left, Ms. Doerr assumed the functions of accounts payable, payroll, accounts receivable and making certain reports.

Mr. McGough testified that the decision to terminate Plaintiff's job was made by him in consultation with Mr. Rosana, the General Manager of the DuBois station, and Mr. Kolobielski, First Media Radio's CEO. Mr. McGough testified that the last consultation (*i.e.*, the final decision) occurred in the October/November 2002 time frame. Mr. McGough determined, with input from Mr. Rosana and Mr. Kolobielski, who had

10

expressed concern over Plaintiff's bookkeeping abilities, that there was an opportunity to eliminate Plaintiff's position at the DuBois station by transferring her tasks to the business manager at the sister State College station (namely, Nancy Doerr), who had the time and skill to do the work. Mr Rosana testified that he participated in making the decision to eliminate Plaintiff's position along with Mike McGough and Alex Kolobielski. Mr. Rosana testified that he and Mr. McGough had discussed at weekly meetings the changes that they were considering, and that they had discussed the situation involving Straub's termination for quite some time.

Alex Kolobielski, the president and CEO, testified that the decision to terminate Straub's job was made by Mr. McGough, Mr. Rosana and himself in November of 2002. Mr. Kolobielski testified that no one individual instigated the decision. Rather, based in part on Plaintiff's marginal bookkeeping skills, in part on the perception that she was in the midst of personnel turmoil at the DuBois station, and in part on the desire to improve efficiency, the three managers came to the idea of having the bookkeeper at the State College station perform the DuBois station bookkeeping duties, as the State College bookkeeper was a "terrific bookkeeper" who "had time on her hands." Mr. Kolobielski testified that he left it to Mr. McGough to determine exactly when Plaintiff's employment should be terminated, and Mr. Kolobielski recalled at his deposition that Mr. McGough had said that it should not be prior to the holidays.

Nancy Doerr, the State College station office manager testified that she knew, by October of 2002, that Mr. McGough was considering having her (Nancy Doerr) assume

11

the bookkeeping duties of the DuBois station in addition to the State College station. Mr. McGough asked Ms. Doerr if she would like to take over the duties of bookkeeping for DuBois. In December of 2002, Ms. Doerr was consulted by Mr. McGough as to the timing of Plaintiff's termination. Mr. McGough asked Ms. Doerr if she thought the end of the year would be a good time to terminate Ms. Straub's employment. Ms. Doerr told Mr. McGough that she thought Ms. Straub's termination should wait until after the year-end audit in case the accountants had questions for the bookkeeper, which at the time was Ms. Straub. The accountants came to do their year-end audit for 2002 at the end of January 2003.

Debbie Nestor, at the DuBois station, continued to perform the receptionist duties and traffic order entry, she expanded her existing role regarding the preparation and sending of the bills to advertising clients by generating the bills as well, and she became responsible for depositing checks received by the Station into its bank account. Within weeks after "downsizing" Straub, Defendant began advertising for a new office employee. [T]he DuBois station hired a part-time employee for coverage of the office during Ms. Nestor's break time or days off, and to assist in the entry of traffic orders.

Following Plaintiff's termination of employment, Plaintiff filed a charge of sexual harassment and retaliation with the Equal Employment Opportunity Commission on or about April 4, 2003.

Plaintiff testified to [an] incident which occurred in her office [during one of the] instance[s] of shoulder-rubbing. Mr. McGough was present at the DuBois station for his

12

regular meeting. McGough walked into Straub's office, put the Motel Note on her desk, and told her she needed to meet him there. As soon as McGough laid the note on Straub's desk, he started rubbing her shoulders and continued to do so throughout the conversation. Plaintiff testified that Mr. McGough told Plaintiff that occasionally she may have to meet him part way between the State College station (where Mr. McGough was based) and the DuBois station, in order for Mr. McGough to sign checks or get papers from Plaintiff. McGough told Straub she "better not let [her] husband see this [the Motel Note]" and then chuckled. Plaintiff told Mr. McGough she was uncomfortable with that, and that Mr. McGough said "well sometimes you got to do what you got to do." Mr. McGough also said he would tell Mr. Rosana to pay for Plaintiff's gasoline should such a trip be necessary. Plaintiff testified that Mr. McGough then left her office to see Mr. Rosana, having been in her office for no more than two minutes in total.

As Daniel Straub, Plaintiff's husband, testified, Plaintiff was uncomfortable driving long distances by herself. Plaintiff testified that she called Nancy Doerr, the business manager at the State College station, to say that she was uncomfortable with having to meet Mr. McGough at the truck stop, and that Nancy Doerr resolved the issue by getting a signature stamp with Mr. McGough's signature for Plaintiff's use. [Plaintiff] told Doerr that McGough had a habit of touching her, and rubbing her shoulders. Doerr told Straub that McGough did the same thing to her. Doerr told Straub that McGough also made her (Doerr) very uncomfortable. Mr. McGough, as District manager, was the sole signator for checks at both the DuBois station, where Plaintiff worked, and the State

13

College station, where his office was located.  The two stations are 75 miles apart.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552- 57, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. and Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638].

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3rd Cir. 1994).

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes*, 398 U.S., at 158-159, 90 S.Ct., at 1608-1609. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).

14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 - 2514, 91 L.Ed.2d 202, 216 (1986).

The Supreme Court has set forth a three step method for analyzing Title VII cases that are presented for summary judgment through circumstantial or otherwise indirect evidence of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805, 93 S.Ct. 1817, 1824-1826, 36 L.Ed.2d 668, 677-679(1973), *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252-256, 101 S.Ct. 1089, 1093-1095, 67 L.Ed.2d 207, 215-217 (1981), *and St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-507 113 S.Ct. 2742, 2746-2747,125 L.Ed.2d 407, 415-416 (1993).[2]

Specifically, a plaintiff has the burden of producing evidence demonstrating his/her *prima facie* case and then the burden of production shifts to the defendant to offer a "legitimate, non-discriminatory reason" for the employer's actions with the burden on the defendant being "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3rd Cir. 1994). At the summary judgment stage, the Third Circuit has set forth the law governing procedure in such motions with regard to what a plaintiff must do to survive such a motion after the defendant offers a legitimate, nondiscriminatory reason:

> This basic framework under Title VII illustrates that, to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the

---

[2]There is some precedent for not following the *McDonnell Douglas* framework in Title VII hostile work environment claims*, see Dickerson v. State of N.J. Dept. of Human Services*, 767 F.Supp. 605, 613 (D.N.J. 1991), but such authority is limited and the Court notes that it was unable to locate authority from the Third Circuit Court of Appeals disapproving the use of this framework in cases such as the present one. Additionally, the Court was able to locate further District Court cases that have employed the *McDonnell Douglas* framework in hostile work environment cases. *See Norman v. University of Pittsburgh*, 2002 WL 32194730, 2002 U.S. Dist. LEXIS 27694 (W.D.Pa. Sep 17, 2002)(applying framework in hostile work environment claim under the ADA) *Persinger v. Delmar School Dist.*, 2004 WL 1534746 (D.Del. Jul 08, 2004) (Title VII hostile work environment claim) *Jackson v. Delaware River and Bay Authority*, 2001 WL 1689880 (D.N.J. Nov 26, 2001)(Title VII and NJLAD claim). The Court sees no reason or legal impediment to applying such a framework in the case *sub judice.*

employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See, e.g., Hicks*, 509 U.S. at ----, 113 S.Ct. at 2479; *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 523 (3d Cir.1992) (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095), cert. denied, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). In other words, because the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, *see Hicks*, 509 U.S. at ----, 113 S.Ct. at 2749, a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case.

***

...to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons, *see Logue v. International Rehab. Assocs., Inc.*, 837 F.2d 150, 155 (3d Cir.1988) (holding that "the district court erred in failing to consider all of [the employer's] proffered evidence of legitimate business reasons for [the plaintiff's] termination" (emphasis supplied)), *aff'd after remand*, 866 F.2d 1411 (3d Cir.1989), was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext). *See Anderson*, 13 F.3d at 1124; *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir.1993).[7]

> [7] We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer

is wise, shrewd, prudent, or competent. *See Ezold*, 983 F.2d at 531, 533; *Villanueva v. Wellesley College*, 930 F.2d 124, 131 (1st Cir.), cert. denied, 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," *Ezold*, 983 F.2d at 531, and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."[8] *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir.1993) (internal quotation omitted); see *id.* at 638 (holding that the proper inquiry is whether the plaintiff has proffered sufficient evidence of "inconsistencies and implausibilities in the employer's proffered reasons"); *Ezold*, 983 F.2d at 527 ("[A] plaintiff has the burden of casting doubt on an employer's articulated reasons for an employment decision." (internal quotations omitted)); *Chauhan*, 897 F.2d at 128. While this standard places a difficult burden on the plaintiff, "[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Ezold*, 983 F.2d at 531.

> [8] Of course, a decision foolish, imprudent, or incompetent by comparison to the employer's usual mode of operation can render it implausible, inconsistent, contradictory, or weak.

*Fuentes v. Perskie*, 32 F.3d 759, 764-765 (3rd Cir. 1994).

This first issue the Court must address is whether the argument first raised by the Plaintiff in her Brief in Opposition to Defendant's Motion (Document No. 32), pp. 1-2, 4-9, that McGough's actions in rubbing the Plaintiff's shoulders after handing her a note and suggesting that she meet him at a truck stop/hotel/restaurant in Philipsburg within the first month of the Defendant's ownership of the station, and the Plaintiff's reaction of indicating she was not comfortable with that idea in fact was the first time the Plaintiff rejected McGough's sexual advances. The Defendant contends that this theory was not mentioned in the Plaintiff's EEOC charge, Complaint or Amended Complaint. Defendant's Reply Brief (Document No. 39).

The Plaintiff responds indicating that the information upon which this theory is based, the August 12, 2002 memo from McGough to Kolobielski, was not discovered until July 26, 2004, the day before

McGough's deposition and as the Court notes, over two months after the filing of the Amended Complaint (May 13, 2004). A review of the EEOC charge, Complaint and Amended Complaint all reveal a charge of retaliation was alleged, but based upon the fact of the Plaintiff's indication to McGough on January 23, 2003 not to touch her again and her subsequent dismissal on February 6, 2003. The Plaintiff is not seeking to add an additional claim to her Complaint nor "blindside" the Defendant with new evidence. The Defendant apparently possessed the "new" evidence, the August 12 memo, and only revealed it to the Plaintiff during discovery. The Defendant has not requested leave to contest the circumstances of the production of the August 12, 2002 memo as recounted by the Plaintiff. Therefore, assuming the Plaintiff's recounting of the revelation of the August 12 memo is correct, the Court finds no prejudice in permitting the Plaintiff to use its original theory of retaliation but recharacterized to allow for the consideration of the fact that McGough called for the termination of the Plaintiff in August 2002 based on the Plaintiff's alleged rejection of McGough's proposition in May 2002. This conclusion is consistent with the Federal Rules of Civil Procedure as such rules permit notice pleading and the use of discovery to more fully refine the issues to be confronted at trial. *See* F.R.C.P. 8; *Roberts v. Acres*, 495 F.2d 57, 58-59 (7th Cir. 1974).

In addition, the facts revealed in discovery relate to the Plaintiff's EEOC claim because they would have been within the scope of the EEOC investigation. *See Antol v. Perry*, 82 F.3d 1291, 1295-1296 (3rd Cir. 1996). Therefore, the Court finds no difficulty in permitting the Plaintiff to argue *facts*, revealed in discovery, to support her claims in opposing a summary judgment motion against such *claims* that were previously plead. The Plaintiff brings forth one count of sexual harassment (hostile work environment) and one count of retaliation under Title VII, and one count for violations of the PHRA

18

which appears to mirror the two Title VII counts.  The Court notes that it must analyze Title VII and PHRA claims similarly. *See Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410-411 (3d Cir. 1999); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir.1997).  Therefore, the Court will address the claims of both statutes under the two separate theories of retaliation and hostile work environment. First, the Court will analyze the Plaintiff's retaliation claim.

## RETALIATION

In order to state a *prima facie* claim for retaliation based upon gender under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) "a plaintiff must show that he/she is engaged in protected activity, that the employer took an adverse employment action against him/her, and that there is a causal connection between the protected activity and the adverse employment action."
*Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 323 (3d Cir. 2000).

The Defendant challenges the Plaintiff's retaliation theory arguing the Plaintiff cannot establish a causal link between her comments to McGough and her termination because the decision to terminate the Plaintiff was made in late October or November 2002 long before the Plaintiff "told Mr. McGough to stop rubbing her shoulders...and when she asked Mr. Rosana what the station's sexual harassment policy was...." Defendant's Brief, pp. 17-18.  In addition, the Defendant notes that McGough's August 12 memo mentions replacement of the Plaintiff and the testimony of two of the Plaintiff's co-workers indicate that the management of the Defendant intended to terminate the Plaintiff prior to the events of January 23 and 27, 2003.  Defendant's Brief, pp. 18-20.  The Defendant also argues that even if the Plaintiff engaged in protected activity on January 23 and 27, 2003, the Defendant as "an employer is not required to suspend a previously contemplated termination of employment in light of the employee's

19

engaging in protected activity, and the fact that the employer does so is <u>not evidence of a causal link</u> between the protected activity and the employment action for the purposes of a retaliation claim." Defendant's Brief, p. 20.

The Plaintiff counterargues that the Defendant focuses on the wrong events, the events of January 23 and 27, 2003 as the starting point for the protected activity when in fact the protected activity began when the Plaintiff in effect rejected McGough in May of 2002 by stating she was "uncomfortable" with meeting him in Philipsburg to sign paperwork and complained about his conduct to Doerr. Plaintiff's Brief in Opposition, pp. 4-9. Based upon this view of the facts, the Defendant argues that the Plaintiff mischaracterizes the May 2002 incident as McGough never propositioned the Plaintiff during this encounter and in fact was just seeking a way to facilitate his need to sign certain checks and paperwork for the DuBois station because he was located in State College and that McGough indicated the Plaintiff "may have to meet him." Defendant's Reply, pp. 4-6. The Defendant argues in essence that McGough's comments were concerning business only, occurred with the Plaintiff's office door open, that she would be reimbursed for gasoline used in traveling, and that the fact that McGough was rubbing her shoulders while this occurred does not convert McGough's comments into a sexual proposition as he rubbed her shoulders on later occasions without propositioning her. Defendant's Reply, pp. 6-7.

The Defendant further argues in footnote four of its Reply that McGough's comment to Plaintiff that she "better not let your husband see this" in reference to McGough's note, which was introduced by affidavit of the Plaintiff and not testified to by her in deposition, is in fact contradictory of her deposition testimony and should not be considered by the Court. Defendant's Reply, p. 7. n. 4. Alternatively, it is argued that even if admissible, the statement does not convert the "conversation into a sexual proposition,

20

in light of Plaintiff's denial that he made any verbal sexual proposition to her." *Id.* The Defendant further argues that 1) the Plaintiff's comment cannot be understood to be a rejection of a sexual advance, 2) the Plaintiff's comment was regarding driving long distance to Philipsburg, not McGough's shoulder rubbing as he continued such acts in the future; 3) rejection of a sexual advance is not protected activity; 4) there was no evidence of a sexual proposition in the May 2002 incident; 5) absence of a causal link between the Plaintiff's termination and the May 2002 incident; and 6) the Plaintiff is without evidence that her reporting the May 2002 incident to Doerr was known to McGough, Rosana or Kolobielski. Defendant's Reply pp. 8-13. Suffice it to say that the Plaintiff responds in her Sur-Reply Brief that the Defendant's arguments above should be rejected for various reasons.

First, the Court does not find contradictory the affidavit of the Plaintiff indicating that "Michael McGough told me 'better not let your husband see this' and then chuckled after handing me the handwritten note with the address of the truck stop/motel and telling me that I would have to meet him there." The Court does not view this additional evidence as contradictory but merely explanatory in nature to the Plaintiff's testimony in deposition. See Plaintiff's Appendix, pp. 124-130. The Plaintiff did not mention the comment from the affidavit in her deposition testimony, but that comment only adds to the content of the conversation. The conversation and the fact that McGough was rubbing her shoulders during the conversation as described in the deposition created the material issue of fact; the additional comment from the affidavit only gives further detail on the situation and does not create a new issue of material fact. The material issue of fact surrounding the conversation with and actions of McGough is whether McGough was in effect sexually propositioning the Plaintiff. Consideration of the comment from the affidavit only elaborates upon this issue. Understanding the testimony of the Plaintiff

21

in deposition was based upon an imperfect memory of the sequence of events and content of conversations (Plaintiff's Appendix, Ex. 1, pp. 125-127), the addition to the evidence of the comment from the affidavit does not contradict the sworn testimony of the Plaintiff and it does not create a new issue of material fact. Therefore, the Court does not find that consideration of the remark in the Plaintiff's affidavit contrary to *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703 (3d Cir. 1988) but more akin to the consideration of the certification found in *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000).

Second, the parties focus on temporal proximity as the proof establishing their views as to retaliation or the lack thereof on the part of the Defendant.[3] It must be remembered that causality, not temporal proximity, is the required element at issue. *See Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997). Furthermore, when basing one's argument for causality on temporal proximity, it is a context-based inquiry where the length of time between the two acts of the protected activity and the retaliation is not established and static for purposes of every retaliation claim. *Kachmar* at 177-178.

The Court does not find that the difference of four months between the incident with the note and McGough's circulation of the August Memo is sufficient time to break the causal link between the two events. The Plaintiff alleges that McGough's motivation was to have the Plaintiff terminated for not giving into his advances in May 2002. Viewing the facts and all inferences thereto in favor of the Plaintiff, the Court believes that it was well within McGough's thinking that immediate termination of

---

[3] It is also possible to prove causality through proof of a "pattern of antagonism" or "direct evidence of a retaliatory animus." *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177-179.

the Plaintiff would raise suspicion with the timing of McGough's actions and that he considered an alternative explanation that could serve as a pretense for the Plaintiff's termination.

The Defendant views the Plaintiff's comment that she was uncomfortable meeting with McGough in Philipsburg as not being a rejection of a sexual advance by McGough but a statement of the Plaintiff's concern for driving long distances alone; this interpretation is for the jury to decide. The Plaintiff's comment could easily be inferred as meaning she was uncomfortable with meeting McGough for what may be perceived as an invitation for sex. Furthermore, despite the Defendant's contentions that McGough never propositioned the Plaintiff, the context in which he invited the Plaintiff to the truck stop/motel in Philipsburg for the purpose of signing office paperwork while rubbing her shoulders could be viewed by the jury as a proposition without necessarily stating words to that effect.

The Court is unaware of any case law that requires sexual advances or propositions to be operative only if they are only verbalized; the Third Circuit has recognized that "explicit request[s] for sex" are not the only basis for a sexual advance. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296 n. 8 (3d Cir. 1997). Finally, the Defendant argues that if the Plaintiff's remark that she was uncomfortable with what McGough suggested is considered a rejection of McGough, the Plaintiff's reporting of the incident to Doerr cannot be considered protected activity under Title VII. The Court agrees with the case of *Farrell v. Planters Lifesavers Co.*, 22 F.Supp.2d 372, 392 (D.N.J. 1998), *aff'd in part, rev'd in part on other grounds*, 206 F.3d 271, 279 n.4 (3d Cir. 2000), that a rejection or resisting of a sexual advance is protected activity under Title VII and the Court also notes that the Third Circuit has also recognized as protected activity the reporting of a sexual advance by an employee to a co-worker so long as that communication is known to have occurred by the employer who then takes adverse action against an

23

employee. *Hazen v. Modern Food Services, Inc.*, 113 Fed.Appx. 442, 443-444 (3d Cir. 2004); *Niederlander v. American Video Glass Company*, 80 Fed.Appx. 256, 260-261 (3d Cir. 2003) *citing Sumner v. United States Postal Service*, 899 F.2d 203, 209 (3d Cir.1990).

The Defendant argues that the Plaintiff's complaints to Doerr and alleged rejection of McGough in May 2002 are not protected activity and, in addition, the Defendant was unaware of the Plaintiff's complaint to Doerr so as to be a basis of adverse action. However, the Court finds that the action of Doerr in raising the solution of the signature stamp to McGough is evidence that McGough implicitly became aware of the fact that the Plaintiff and Doerr spoke of McGough's request of the Plaintiff to meet him in Philipsburg. Therefore, this would demonstrate that the Plaintiff's complaint to Doerr was known to the Defendant because Doerr suggested to McGough that a signature stamp would be a better solution to the issue of signing paperwork from the DuBois station. Additionally, in agreeing with the *Farrell* court, the Court also finds that the evidence of the Plaintiff noting her uncomfortableness with meeting McGough in Philipsburg is evidence of a rejection of an alleged sexual advance by McGough and is also protected activity.

Thus, the Plaintiff has established the first two elements of a *prima facie* retaliation case under Title VII. The difficulty arises under the analysis of the third element of causation. The Plaintiff argues that the recommendation of McGough in the August 2002 Memo demonstrates retaliation for the Plaintiff's rejection of his advance in May 2002. This is certainly a plausible theory, but the Court notes that timing of the employer's action alone does not automatically establish causation:

> We believe that, if *Jalil* is to be interpreted as holding that timing alone can be sufficient, that holding must be confined to the unusually suggestive facts of *Jalil*. Thus, even if timing alone can prove causation where the discharge follows only two days after the complaint, the mere fact that adverse employment action occurs after a complaint will

24

> ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.

*Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997). It has also been noted in *Robinson* the type of actions that constitute adverse employment actions:

> Retaliatory conduct other than discharge or refusal to rehire is thus proscribed by Title VII only if it alters the employee's "compensation, terms, conditions, or privileges of employment," deprives him or her of "employment opportunities," or "adversely affect[s] his [or her] status as an employee." It follows that "not everything that makes an employee unhappy" qualifies as retaliation, for "[o]therwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'"

*Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3rd Cir. 1997) (citations omitted). The Court notes the distinction between the case *sub judice* and *Robinson* as to the element of causation. In *Robinson,* the alleged retaliation of denial of computer access was caused by a co-worker who was not proven to have acted in retaliation against the Plaintiff as she was not proven to have been involved in the harassment of Robinson; on the other hand the actions of McGough in drafting the August 2002 Memo establish the necessary causal link of retaliation from the Plaintiff's alleged rejection of him in May 2002.

The Court agrees with the Defendant that had the Plaintiff's case rested upon only the Plaintiff's rejection of McGough in January 2003 and her inquiry into the sexual harassment policy that same month, the causal link would be missing as the evidence would show the decision to terminate the Plaintiff came around late October or November 2002 and thus such a decision to terminate the Plaintiff could not be actionable as it already would have been contemplated. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272, 121 S.Ct. 1508, 1510-1511, 149 L.Ed.2d 509, 514-515 (2001). However, viewing the case as the Plaintiff does, with the May 2002 actions of McGough being the alleged impetus for McGough's suggestion as early as August 2002 that the Plaintiff be terminated for reasons the Plaintiff views as

25

pretextual, the events of May and August 2002 place a more favorable view of the Plaintiff's case with the culmination of the adverse action being in February 2003.

In conclusion the Court finds that the Plaintiff has stated a *prima facie* case of retaliation under Title VII for purposes of the present summary judgment motion under the *McDonnell Douglas* framework. The next step is for the Defendant to put forth a legitimate non-discriminatory reason for its actions. However, the parties in the case *sub judice* only analyzed the existence of a *prima facie* case and did not proceed further in their analysis. The Court could easily guess what legitimate non-discriminatory reason the Defendant might proffer, but that is not our duty. Since the parties did not carry out further the *McDonnell Douglas* analysis to step two and beyond, thus only concentrating on the existence of a *prima facie* case, the Court finds that material issues of fact exist as to the Plaintiff's claims of retaliation. Therefore, this claim will proceed to trial.

## HOSTILE WORK ENVIRONMENT

> To bring an actionable claim for sexual harassment because of an intimidating and offensive work environment, a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee." *Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1510 (11th Cir.1989) (emphasis in original). We hold that five constituents must converge to bring a successful claim for a sexually hostile work environment under Title VII: (1) the employees suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Cf. Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 619-20 (6th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987).

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990) (footnote omitted).

Before proceeding with our analysis, the Court recognizes, as the Plaintiff did in footnote eighteen

26

in her Brief in Opposition that the Third Circuit uses the terms "pervasive and regular" for the second element of a *prima facie* case of hostile work environment while the Supreme Court in the case of *Faragher v. City of Boca Raton*, 524 U.S. 775, 786-787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662, 675 uses the term "severe or pervasive." The language of the Supreme Court test originates in the case of *Meritor Savings Bank v. Vinson, et al.*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405-2406, 91 L.Ed.2d 49, 60 (1986) and *Meritor* cited the Eleventh Circuit case of *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982) to support its finding. However, *Henson*, after finding that "the state of psychological well being is a term, condition, or privilege of employment within the meaning of Title VII" makes the following finding:

> For sexual harassment to state a claim under Title VII, it must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment. Whether sexual harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well being of employees is a question to be determined with regard to the totality of the circumstances.

*Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982) (citations omitted). The Third Circuit language originates from the case of *Andrews v. City of Philadelphia, et al.*, 895 F.2d 1469, 1482-1484 (3d Cir. 1990) and does not consider the severity of the conduct: "the discrimination was pervasive and regular". It appears that this language was first used and developed in the *Andrews* case itself. The Court notes that *Andrews* post-dates *Meritor* and that the absence of explanation as to why *Meritor's* language was not mimicked in the *Andrews* opinion is confusing. However, the case of *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710 (3d Cir. 1997) uses the language of *Meritor* while other opinions addressing supervisor sexual harassment, such as those in the cases of *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1304 (3d Cir. 1997) and *Knabe v. Boury Corp.*, 114 F.3d 407 (3d Cir. 1997), still utilize the "pervasive and regular" language. The Third Circuit appears to view the tests as different:

27

> We note that the *Andrews'* formulation differs from *Meritor* in that Andrews suggests that the discrimination must be "pervasive and regular" whereas the Supreme Court described that element as "pervasive or severe." Both tests are met here so we do not find it necessary to resolve whether this was inadvertent although we understand that the distinction may be important. *See T.L. v. Toys 'R' Us, Inc.,* 255 N.J.Super. 616, 605 A.2d 1125, 1138 (App. Div. 1992), *affi'd as modified sub nom. Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 626 A.2d 445 (N.J. 1993); *id.* at 1145 (Skillman, J.A.D., concurring & dissenting); *Watts v. New York City Police Dep't,* 724 F.Supp. 99, 106 n. 6 (S.D.N.Y. 1989).

*Bouton v. BMW of North America, Inc.,* 29 F.3d 103, 106 n.2 (3d Cir. 1994). Nonetheless, in viewing the facts in the light most favorable to the Plaintiff, the Court need not await a definitive decision from the Third Circuit on this issue under either test, if indeed they are viewed as substantively different; the Plaintiff has produced evidence of record that demonstrates that McGough's actions were sufficiently pervasive to preclude summary judgment under either test.[4]

The *Meritor* test only requires severity *or* pervasiveness while the *Andrews* test refers to "pervasive and regular." The evidence of record demonstrates that McGough rubbed the Plaintiff's shoulders and/or back at least six times, pinched her cheek three times and touched her hair while commenting on her change in hair color once.

> The trial court recognized that a decision regarding hostile work environment should be made viewing the totality of the circumstances, but somewhat misapplied the concept. Particularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities. A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario. As the Court of Appeals for the Eleventh Circuit noted, the factfinder in this type of case should not "necessarily examine each alleged incident of harassment in a vacuum. What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several

---

[4]The Court notes the *Meritor* test is a disjunctive while the *Andrews* test is essentially a test of pervasiveness and regularity, *i.e.,* one half of the disjunctive of the *Meritor* test. Therefore, by meeting the pervasiveness half of the *Meritor* test, the Court believes that the Plaintiff survives summary judgment under both tests.

other related incidents." *Vance*, 863 F.2d at 1510. The factfinder must not only look to the frequency of the incidents but to their gravity as well.

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990).

The Defendant challenges three elements of the Plaintiff's *prima facie* case: the pervasiveness of McGough's conduct, the subjective understanding and the objective understanding of McGough's behavior toward the Plaintiff.

Viewing the facts in the totality of the circumstances, the Plaintiff has established evidence of record that creates a genuine issue of material fact as to whether the actions of McGough, a supervisor of the Plaintiff, engaged in acts violating the Plaintiff's rights under Title VII. McGough did not work daily at the DuBois Station but had been known to be there once or twice a week and then be absent for weeks. The Defendant contends that because they did not work together, McGough's infrequent contact with the Plaintiff could not be the basis of pervasive harassment and cites the case of *Bacone v. Philadelphia Housing Authority*, 2003 WL 21223822, at *3, 2003 U.S.Dist. LEXIS 8818, at *11-12 (E.D.Pa. May 7, 2003). *Bacone* concerned four instances of harassment in a two week period which included grabbing the plaintiff's groin, staring at him, exposing of the harasser's breasts to the Plaintiff and telling the plaintiff that she wanted to take him home and in another instance, called him profane names. *Id.* The Court noted that outside of these acts, the two had "little or no contact". *Id.*

The conduct at issue in the case *sub judice* lasted over a longer period of time (ten months), and did not occur on a daily basis as McGough was based at the State College station, not the DuBois station. However, McGough's conduct was repeated and always involved physical touching that was uninvited by the Plaintiff. It is true that McGough ceased his shoulder rubbing of the Plaintiff once the Plaintiff remarked to him not to do it again on January 23, 2003 and that prior to that the Plaintiff's one other

29

previous remark was that she was uncomfortable meeting McGough in Philipsburg. The reason for the absence of protest from the Plaintiff on the other occasions is unclear and is for the jury to decide. For our present purposes, the Court finds that sufficient evidence exists to establish a material issue of fact as to whether the acts of McGough were pervasive and regular. The Court cannot automatically exclude the Defendant from liability on this count because the alleged offending supervisor did not work with the Plaintiff on a daily basis. Such logic would immunize traveling supervisors who harass employees located at various offices within a company.

Therefore, the Court distinguishes this case from *Barcone*. Contrary to the Defendant's reading of that case, the Court finds that it may be possible to find a lack of pervasiveness and regularity, like the finding in *Barcone*, when a plaintiff and the harasser do not have regular contact by the fact that they work together infrequently because the frequency of the harassment did not amount to being "pervasive and regular" and not solely because they did not work together on a daily basis. That is to say, the frequency of the alleged harassment not the amount of time the supervisor and employee worked together, would appear to be the relevant inquiry. On the facts in the case *sub judice*, there exists evidence that McGough allegedly harassed the Plaintiff on average once per month. The Defendant notes the brevity of such alleged harassment, in addition to the context of those alleged incidents. Viewing the evidence and inferences in the light most favorable to the Plaintiff, the Court finds the context of McGough's actions can be viewed by a jury as creating a hostile work environment.

Moreover, viewing the evidence in the present summary judgment motion, the Court does not find the brevity of the incidents to be fatal, as sexual harassment is not defined by a stopwatch, but the context in which the alleged actions took place. Certainly, the Defendant is welcome to present evidence at trial

30

as to the length of the encounters and the verbal exchanges that occurred during the McGough's contact with the Plaintiff; without such evidence, the picture of McGough's actions would be incomplete. However, at this summary judgment stage, the evidence favors the Plaintiff's reading of the evidence of record.

The same holds true of the subjective and objective views of McGough's conduct. The Plaintiff clearly felt McGough's actions were objectionable and this is evidenced by the fact that she spoke to Doerr, her husband and finally McGough himself regarding her disfavor of his actions. Clearly, McGough's actions bothered the Plaintiff to the extent that she told her husband of each instance of his touching her. Therefore, the subjective component of the *prima facie* case is established.

On the objective side, the Court must decide if a reasonable person in the Plaintiff's position would have viewed McGough's actions as "hostile or abusive." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). A review of the evidence in the light most favorable to the Plaintiff reveals that McGough engaged in ten instances of physical contact with the Plaintiff's cheeks, shoulders and back, that was uninvited, and coupled with remarks at times referring to the Plaintiff's physical beauty or appearance and/or conversational "chit-chat" while the Plaintiff was either working in her office, on a smoke break or conversing with fellow employees. These contacts were more frequent than the contacts cited to by the Defendant in the case *Lulis v. Barnhart,* 252 F.Supp.2d 172, 176-177 (E.D.Pa. 2003).

Although the Court notes that cases exist where the number of contacts from an alleged harasser have been greater in number and courts have not found such contact pervasive, *see Baskerville v. Culligan Int'l Co.,* 50 F.3d 428 (7th Cir. 1995)(nine incidents in seven months but none of them involved touching

31

of plaintiff or propositions to have sex), this Court chooses not to engage in relative comparison of the actually number of contacts by an alleged harasser but rather to evaluate the specific case *sub judice* with an eye toward to type of contact and its frequency.

McGough was the Plaintiff's supervisor but was not someone she worked with everyday, the record does not reveal that the Plaintiff and McGough socialized outside of the employment atmosphere or were friends, and McGough was aware that the Plaintiff was married. Additionally, the Plaintiff objected to meeting McGough in Philipsburg stating she was not "comfortable" with it, but McGough continued his physical contact with the Plaintiff until she explicitly told him not to touch her again. McGough made a comment about not letting the Plaintiff's husband see his note regarding the place in Philipsburg where he suggested they meet. The Court finds that based upon these facts and inferences, the Plaintiff has sufficient proof that a reasonable person in the Plaintiff's position would find McGough's conduct abusive.

The parties do not proceed to the second step of the *McDonnell Douglas* in their analyses of the hostile work environment claim and therefore, the Court need not proceed further. The Court hereby denies the Defendant's motion for summary judgment as to the Plaintiff's hostile work environment claims.

An appropriate Order follows.

**AND NOW**, this 28th day of November, 2005, this matter coming before the Court on the Defendant's Motion for Summary Judgment (Document No. 24), IT IS HEREBY ORDERED THAT the Defendant's Motion is DENIED.

BY THE COURT:

KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE

cc:     Samuel J. Cordes, Esq.
        Jacqueline Koscelnik, Esq.

33